NIMMONS, Judge.
In this case involving the application of the Adult Protective Services Act (Sections 415.101-.113, Florida Statutes) (hereinafter sometimes referred to as the “Act”), appellant challenges a final order of the Department of Health and Rehabilitative Services (Department) denying appellant’s request to expunge a confirmed report of neglect. Appellant asserts that: (1) there is no competent, substantial evidence to support a finding of neglect; and (2) the Department departed from the essential requirements of law by placing appellant’s name on the abuse registry for neglect when there is no showing of proximate cause between appellant’s failure to check a disabled adult’s dilantin blood level and the potential to harm the disabled adult patient. On both of these issues, we affirm.
C.C., a mentally retarded person with a history of seizure disorder, has been a resident, since 1983, of an adult congregate living facility. Since 1983, the facility has been owned by B.B.A. and his wife. The latter is. the administrator. C.C. was hospitalized in March 1986 for thrombophlebitis of the leg and an underlying diagnosis of seizure disorder. While hospitalized, C.C. suffered additional seizures. Physician B.B.A. treated C.C. and prescribed several medications to control C.C.’s seizures, including dilantin. After C.C. was discharged from the hospital on April 2, 1986, B.B.A. did not check C.C.’s dilantin blood level until September 7, 1987, when he was re-hospitalized for nausea, vomiting, gastritis, and dehydration. Several days later, C.C. was released from the hospital but was later readmitted in a comatose state on September 12, 1987.
A Department investigator, after reviewing C.C.’s medical files and interviewing medical personnel, reported that B.B.A.’s failure to check C.C.’s dilantin blood levels *956 for the period from March 27, 1986 to September 7, 1987, constituted a confirmed report of neglect. The Department approved the investigator’s referral report and placed B.B.A. on its central abuse registry under Section 415.103(3)(c), Florida Statutes.
B.B.A. challenged the Department’s determination of neglect and a hearing was held to determine whether the Department’s classification of caregiver B.B.A.’s treatment of a disabled adult, C.C., as a confirmed report of neglect should be amended or expunged. Dr. Carlos Leon-Barth, a neurologist, opined that blood tests should be performed at least once a year for the purpose of checking a seizure patient’s dilantin level. He further stated that this was particularly important when dealing with mentally retarded patients like C.C., who may not take their medication regularly and may suffer seizures as a result.
The hearing officer found that C.C. was a “disabled adult” within the meaning of Section 415.102(8), which provides:
(8) “Disabled adult” means a person 18 years of age or older who suffers from a condition of physical or mental incapacitation due to a developmental disability, organic brain damage, or mental illness, or who has one or more physical or mental limitations which restrict his ability to perform the normal activities of daily living.
The hearing officer also found that B.B.A. was a “caregiver” as that term is defined in Section 415.102(4):
(4) “Caregiver” means a person or persons responsible for the care of an aged person or disabled adult. “Caregiver” includes, but is not limited to, relatives, adult children, parents, neighbors, day care personnel, adult foster home sponsors,- personnel of public and private institutions and facilities, nursing homes, adult congregate living facilities, and state institutions who have voluntarily assumed the care of an aged person or disabled adult or have been entrusted with the care of an aged person or disabled adult on a temporary or permanent basis.
The hearing officer concluded that B.B.A.’s failure to check C.C.’s dilantin blood level during the period from March 27, 1986 to September 7, 1987, constituted a confirmed report of neglect. He recommended that the Department deny B.B.A.’s request to expunge the confirmed report of neglect. The recommended order was fully adopted in a final order by the Department, which B.B.A. now challenges on appeal.
The Act requires that the Department, among other things, investigate and classify reports of abuse to disabled adults. The procedures for conducting an investigation of a report of abuse are provided for in Section 415.103. The appellant stipulated that the Department followed the required procedures in this case.
Upon completion of an investigation, the Department is required to classify the abuse report as “confirmed,” “indicated,” or “unfounded.” Under Section 415.102(5), a “confirmed report” is one where the “investigation determines that abuse, neglect, or exploitation has occurred and the perpetrator is identified.”
B.B.A. first challenges the Department’s final order on the grounds that there is no competent, substantial evidence that his treatment of C.C. constituted neglect.[1] The term “neglect” is defined in Section 415.102(13) as follows:
(13) “Neglect” means the failure or omission on the part of the caregiver or aged person or disabled adult to provide the care and services necessary to maintain the physical and mental health of an aged person or disabled adult, including, but not limited to, food, clothing, medicine, shelter, supervision, and medical services, that a prudent person would deem essential for the well-being of an aged person or disabled adult.
*957 The neurologist’s unrebutted testimony is that a prudent level of care for a mentally retarded, known seizure disorder patient like C.C., is a minimum yearly checkup for dilantin blood levels. Further, B.B.A. also admitted that while under his care, he did not check C.C.’s dilantin blood level from March 27, 1986 to September 7, 1987. Accordingly, we find competent, substantial evidence to support the Department’s final order finding that caregiver B.B.A. was guilty of “neglect” within the meaning of the Act.
Next, we find B.B.A.’s second contention, that the Department departed from the essential requirements of law because it did not prove a proximate cause relationship between B.B.A.’s care and C.C.’s subsequent seizures, is without merit.
At the hearing, the unrebutted testimony of the neurologist was that a physician’s failure to check annually a disabled adult’s dilantin blood level falls below a prudent level of care because if the disabled adult is not taking his medication properly, seizures may result. The fact that there is no evidence that C.C.’s blood level was subthera-peutic from March 27,1986 to September 7, 1987 is, by itself, not determinative since B.B.A. provided substandard care while under a duty to monitor C.C.’s condition at least yearly, in order to prevent seizures or more serious complications from developing.
This is, of course, not a tort action wherein damages and the legal cause therefor must be shown. Nor does the fact that a disabled adult such as C.C. might contribute, by his own acts or omissions, to imperiling his health insulate the caregiver from the latter’s failure to satisfy the above statutory standard.
AFFIRMED.
SMITH, J., concurs.
ZEHMER, J., dissents with written opinion.

. B.B.A. does not challenge the hearing officer's findings that (1) he was a "caregiver”; and (2) C.C. was a “disabled adult.”